IN THE UNITED DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,

v.                                                            Docket No: 1:15cr20755

CARLEANE DIANA BERMAN (7)

       Defendant,
_____/

**DEFENDANT CARLEANE BERMAN'S
MEMORANDUM IN AID OF SENTENCING**

Defendant Carleane Diana Berman respectfully submits this Memorandum in Aid of Sentencing, in advance of her sentencing pursuant to Federal Rule of Criminal Procedure 32(c) and Local Rule 88.8. Ms. Berman's sentencing is scheduled for April 4, 2016.

## I. BACKGROUND

Carleane Berman pled guilty to Counts 2 and 3 of a 14 count superseding indictment charging conspiracy to possess with intent to distribute a detectable amount of Ethylone and Methylone in violation of Title 21 U.S.C. § 846, Count One and Count 3 conspiracy to transmit monetary instruments from the United States to a place outside of the United States in violation of Title 18 U.S.C. § 1956(h).

Ms. Berman became involved in this offense when she was introduced into the business of selling Molly by her ex-boyfriend and co-Defendant Jorge Hernandez. Although Ms. Berman at the time was rather young, she did not need the money, nor did she benefit from any money for the illegal sales of the Molly. Her involvement was at the behest of her manipulative and boyfriend, Hernandez.

At a very young age (18 years old), Ms. Berman became an entertainment webcam model for the pornography industry. That field lured her into the South Florida underground "night-life." That lifestyle fueled the illegal distribution of Molly as the drug was widely used in the clubs she frequented with Hernandez. Her parents feeling that they were losing control of their young daughter, resorted to Baker Acting Ms. Berman and applying for Marchman Act Order against her as young as the age of 18. (See Exhibit A)

Treatment for her drug abuse at such a young age has not been easy. She has also attended several drug rehabilitation in-patient programs, mostly with only short-term success. Upon leaving from the programs, she resumes her life of the "adult super club" and would run away from her parents' home on multiple occasions. Regrettably Ms. Berman, became involved in the Molly Club scene and between December 2013 and June 2014 wired over $10,000.00 to China to pay for Molly that Hernandez had ordered using her real driver's license, as well as several fake driver's licenses that were provided to her by Hernandez and began assisting

Hernandez with the handling of the Molly. At the time, Ms. Berman did not know the devastating effects of her actions.

Ms. Berman understands that she has committed a serious offense and she takes full and complete responsibility for her actions. Her letter to the United States Probation Officer accepting responsibility for her conduct is set forth as follows:

To the Honorable Court,

I want to apologize to my actions and my involvement in this offense. I adopt the facts of proffer presented on the day I pled guilty. I accept responsibility for my actions and I am ashamed of what I have done. I accept full responsibility for my actions. I apologize to this Honorable Court, the Government and especially my family. I know that given an opportunity I will become a productive member of society.

## II. COOPERATION

Ms. Berman began cooperating with the authorities as soon as she was arrested and became aware of the grave mistake that she had committed. There was no hesitation on her decision to try and correct her mistakes. There have never been any attempts to minimize her involvement in the offense and there were no attempts to minimize the effects of the harm she has done. She met with the U. S. Attorney's Office and the Agents of the case on numerous occasions and spent many hours answering questions and supplying information on a variety of subjects of interest to the Government. As this Court recalls, Ms. Berman testified

vigorously and under much embarrassment due to her chosen profession, during two separate trials of co-Defendant Mario Melton.

It is anticipated that as a result of the extensive trial testimony and Ms. Berman's cooperation that the Government will be filing a motion under § 5K1.1 and recommending to this Honorable Court that Ms. Berman's ultimate sentence be reduced due to her cooperation.

### III. MANDATORY SENTENCING FACTORS IN SECTION 3553

It is respectfully suggested that a sentence below the low end of the adjusted cooperation sentencing guidelines range would accomplish the goals of sentencing as set forth in Title 18 U.S.C. § 3553(a), based upon the nature and circumstances of Ms. Berman's offense, her history and characteristics, and her immediate cooperation with the prosecution in this matter.

It is well established that the Sentencing Guidelines are no longer mandatory and constitute only one of the sentencing factors that the Court must consider under 18 U.S.C. §3553(a). *United States v. Booker*, 125 S. Ct. 738, 757 (2005). Although the Guidelines are now merely advisory, the provisions under 18 U.S.C. §3553(a) are mandatory and contain an overarching provision instructing district courts to impose a sentence sufficient, but not greater than necessary to accomplish the goals of sentencing under that provision. Kimbrough v. United States, 128 S. Ct. 558, 570 (2007).

The factors set forth in 18 U.S.C. § 3553(a) include: (1) the history and characteristics of the offender, (2) the nature and circumstances of the offense, and (3) the need to provide just punishment and adequate deterrence. As set forth in the plea agreement, the Government has agreed to seek a sentence of the low end of the guideline range, and it is expected that a motion for sentence reduction under the United States Sentencing Guideline Section 5K1.1 will also be filed.

As such, a reasonable application of the factors set forth in 18 U.S.C. § 3553(a) supports a sentence for Ms. Berman at the low end of the guideline range, determined after this Court applies any significant variances due to Ms. Berman's troubled past and due to the outstanding cooperation efforts provided in the instant matter.

## IV. HISTORY AND CHARACTERISTICS OF CARLEANE BERMAN

This Court is required to consider Ms. Berman's entire background under Title 18 U.S.C. § 3553(a)(1) including her criminal history, age, education, employment history, family ties, lifestyle, commitment to the community, and post-offense conduct to inform its evaluation of her history and characteristics. In this case, each of these factors reveal Ms. Berman to be a good daughter and devoted to her family and a devoted friend and a devoted companion to her friends. Ms. Berman is 21 years old. She was born in Miami, Florida to the married union of Ron Berman and Carmen Berman. She was born to a family of hard working

parents and for the most part, her childhood was normal. Through the age of 14, most of Ms. Berman's life was uneventful and the family enjoyed many loving times together. Ms. Berman was en-route to become a productive member of society in all respects. (See Exhibit B)

However, after Ms. Berman turned 15, the teenage years were very traumatic. Ms. Berman and her Father's relationship deteriorated. The breakdown was so severe, that Ms. Berman and her Father would actually get into physical altercations resulting in the police being summoned. In order to avoid further confrontations, although she was young, Ms. Berman chose to run away from home and entered the downward spiral that resulted in this grave mistake. (See Exhibit C)

Ms. Berman at a very young age felt betrayed when she realized that her Father was having an affair with a family friend. To complicate the matter further, she also learned that her Father was recovering from an addition to crack cocaine. In order to cope with the negative information overload she was receiving, Ms. Berman began smoking marijuana and sneaking out of the house with her friends. Once addicted to marijuana, she was introduced and addicted to abusing other illegal drugs. She believes that the sequence of events during that short period of time contributed to the poor decisions that she has made which led to the current situation. Further complicating Ms. Berman's upbringing, at the young age of 14

she was sexually assaulted by a close friend from school. The authorities were notified, however in order to prevent any further issues and embarrassment, she denied that the incident ever occurred.

Although her parents relocated Ms. Berman from the school she was attending at the time, she quickly began skipping from her new school to "party" and use drugs. Due the extensive drug abuse, her relationships with significant others always encompassed domestic violence and continual heavy drug usage.

In December of 2013, Ms. Berman began to date Jorge Hernandez, the lead co-Defendant in this case. Immediately after she moved in with Hernandez, he became very violent and reportedly pointed weapons (guns) at her advising her that if the relationship would end he would hurt her. As the drug addiction became so uncontrollable and unmanageable, she decided to continue using drugs in order to "put up with Hernandez." Hernandez would then encourage her to further use drugs in order to maintain his total control over her. Interestingly enough, Hernandez became Berman's primary drug supplier and on multiple occasions would use drugs together with her.

In April of 2013, Ms. Berman found the courage to leave the relationship and left Hernandez. Unfortunately, the damage was already done and ultimately Ms. Berman was arrested and charged with the instant offense.

7

Notwithstanding the traumatic upbringing during her teenage years, Ms. Berman still has the love and support of her family, multiple friends and from the community. Her Father, Ron Berman, describes her as a "beacon of joy and happiness in their life." Further noting that Ms. Berman was an honor student at Jack D. Gordon Elementary School remembering how she attended dance lessons, took music lessons at Miami-Dade Community College South Campus, enjoyed being involved with horses and volunteering at nearby stables caring for the horses she loved to ride. (See Exhibit D).

As a proud Mother, Carmen Berman remembers her living in a childhood that was "happy, safe, and stable." She recalls Ms. Berman earning "excellent grades earning all A's and B's and always on the Honor Roll." She was also participated in the chorus and was attending Ammonds Magnet Middle School. With all appearances, Ms. Berman's family ties were very supportive as a normal child and parent relationship should develop. As things became more chaotic in Ms. Berman's upbringing, her parents attempted to seek professional help in an attempt to deal with the demons in Ms. Berman's past. (See Exhibit E). No child should have to face the demons that Ms. Berman has dealt with at such a young age.

Furthermore, multiple friends of the family have come forward to support Ms. Berman during these troubled times and have offered multiple letters of support to advise the Court of who Carleane Berman really is.

For example, Brenda Llera writes that as a single mother herself, she has realized how hard it is to raise her own daughter who was making her own poor choices in life. Her daughter, entered the adult production industry where Ms. Berman advised her that that was not the avenue to proceed and pointed Ms. Llera's daughter in the right direction. She describes Ms. Berman as intelligent, capable and a personable and dedicated young woman. She has a willing heart to help others, and requests that this Court offer her an opportunity to help teens with behavioral issues similar to the ones that Ms. Berman has suffered. (See Exhibit F)

Damion Hew, a friend of the family writes that he has known Ms. Berman for some time and realizes that the "hard shell" that she portrays is nothing more than an attempt to defend herself from her past. He describes Ms. Berman as a sweet open minded person accepting others and not being judgmental. Mr. Hew recognizes Ms. Berman's vulnerable side which she attempts to cover up with her "hard shell persona." Although Mr. Hew understands that Ms. Berman's past has not been straight and narrow, he understands that given the circumstances, Ms. Berman can be a better person and progress in society. (See Exhibit G).

Ms. Marie De Arellano writes the Court in support of Ms. Berman's sentencing as well. She has known Ms. Berman for several years and considers her to be a person with a great heart; that is full of ambition. She understands that Ms. Berman, along with co-Defendant Ashley Sue Morales, will suffer from this day on from the different issues brought upon them by the violence that is caused by Hernandez. She supports Ms. Berman through this tough time and understands that when Ms. Berman receives the help she needs that Ms. Berman will be the productive member of society that she deserves to be. (See Exhibit H)

A friend of the family, Julio Acosta, also writes to advise the court how he has had the pleasure of knowing "Carlinsita" since she was 14 years old. They grew up together, were lost souls, ever searching; the black sheep of our families, and quickly bonded over teenage angst, uncertainty, over their sense of humor. He is wounded but proud of her; and relieved to know she is striving to accept her pain and hopes and yearns for her future. It is clear that Mr. Acosta, has been hurt by the sequence of events in Ms. Berman's life, but has acknowledged that she will overcome these tough days that will follow. (See Exhibit I)

Finally, Mr. Darling Hernandez writes he has known Ms. Berman for about 5 years. He has witnesses the involvement in the "dark side" and watched how Ms. Berman has fallen prey to addiction and manipulation. However, he notes

how she has worked how to take advantage of the second chances she has been offered and can hear the sincere regret in her voice. (See Exhibit J)

United States District Judge Rakoff eloquently summed up the delicate balance of weighing the good with bad when weighing a man's life within the context of his history and characteristics:

> "As these examples attest, Adelson's [the Defendant's] good deeds were not performed to gain status or enhance his image. Most of them were unknown to all but a few people until the time of his sentencing. But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*Id. United States v. Adelson*, 441 F.Supp.2d 506, 513 -514 (S.D.N.Y., 2006)

Like the defendant in *Adelson*, Ms. Berman's good deed with Mrs. Llera's daughter was not done to enhance her self-image. To the contrary, her commitment to this young lady to keep her out of the adult pornographic industry was quietly and selflessly done. This commitment speaks loudly in behalf of the good that is Ms. Berman and the meaningful contributions she has and will continue to make to society.

11

## V. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

The factual basis in the instant offense reads as follows:

Sometime between December 2013 and April 2015, Ms. Berman participated in a conspiracy that involved the unlawful distribution of molly (a colloquial term for certain drugs similar to ecstasy that include schedule I controlled substances, such as methylone and ethylone).

Ms. Berman's role was to receive packages of molly that were being shipped from China, to wire money to China for payment for the molly, and to capsulate molly pills. Ms. Berman was in a relationship with Jorge Hernandez ("Hernandez") from about December
2013 through April 2015. At that time, Hernandez was, among other things, ordering packages of moly from China and having them shipped to various locations in the United States. While Ms. Berman lived with Hernandez, Hernandez got her into the molly business. For over a year, Ms. Berman made capsules of molly, picked up packages, and wired money to China. According to Western Union ("WU") business records, from December 2013 through June 2014, Ms. Berman wired over $10,000 to China using her real name and real driver's license.

Surveillance videos from multiple Publix stores in Miami-Dade show Ms. Berman accompanying other women at the Western Union stand, while the other women sent money, using their real driver's licenses. These videos match WU business records. Hernandez had numerous counterfeit drivers licenses (DLs) made for BERMAN and other women so they could wire money to China. Hernandez provided agents with two counterfeit New York DLs showing Ms. Berman's photograph, but with false identifiers, including the name (*i.e.,* only the photo was real). WU records show one of these DLs number with corresponding identifiers sending money to China from Miami. Agents also obtained a photo of a third counterfeit DL with Ms. Berman's photo, and WU records also show that DL number sending money to China.

## VI. JUST PUNISHMENT AND ADEQUATE DETERRENCE

The careful balance between just punishment and adequate deterrence will

not be served by a lengthy incarceration of Ms. Berman.  The history of Ms.

12

Berman's troubled past must be taken into account when a final sentence is determined.

The United States Probation Officer in its first draft if the PSI Report dated April 4, 2016 has determined that Ms. Berman's sentencing guideline be calculated at an offense level 29 with a Criminal History Category (CHC) of I, for a recommended imprisonment range of 87 to 108 months.

However, currently pending before this Court are Ms. Berman's objections to the PSI Report, where it is requested that the Court consider Ms. Berman's minimal participation in the charged offense and that the Court consider the manipulation by co-Defendant Hernandez in Ms. Berman's life. Should the Court grant the pending objections, the sentencing guideline recommended range would be reduced to 57 to 71 months incarceration. Furthermore, a sentence outside the low end of the guidelines would reflect a proper balance between just punishment and adequate deterrence. Incarceration serves dual purpose of retribution and deterrence. Even with minimal incarceration, Ms. Berman can be a contributing member of society once again. Ms. Berman is being treated by Phycologist Arthur J. Brigman, who has diagnosed her with attention deficit disorder and bipolar disorder, placing her on a medication program to manage her mental disorders. (See Exhibit K) Furthermore, as part of pre-trial release supervision, Ms. Berman has been attending substance abuse counseling incident free and has never failed to

report to pre-trial supervision as required. During these trouble times Ms. Berman has maintained full time employment until recently when she terminated all contact with the adult entertainment industry.

Ms. Berman accepts the responsibility for her conduct. A sentence outside of the low end of the cooperation recommended guideline range is reasonable in light of the factors set out in Section 3553. Incarceration is a serious sentence for Ms. Berman's involvement in the charged offense. Any term of incarceration will reflect the seriousness of the offense, will promote respect for the law, will provide just punishment, will afford adequate deterrence to criminal conduct, and will protect the public from further crimes of Ms. Berman. *See* Title 18 U.S.C. § 3553. The Courts have found that there is "considerable evidence" that even a relatively short sentence can have a deterrent effect on an offender. See *Edelson*, 441 F.Supp.2d at 514.

### VII. THIS COURT'S SENTENCE OF MS. BERMAN SHOULD NOT BE ANCHORED BY THE ADVISORY GUIDELINES

It's more than eleven years since the Supreme Court's landmark decision in *United States v. Booker,* 543 U.S. 220 (2005). Since the *Booker* decision, it has become well-established that district courts make an "individualized assessment based on the facts presented." *Gall v. United States,* 552 U.S. 38, 50 (2007). Under *Gall*, the Court must impose a sentence that is both procedurally and substantively reasonable. *Gall v. United States*, 128 S. Ct. 586, 597 (2007). For a

14

sentence to be procedurally sound the Court must correctly calculate the advisory guideline range, treat the guidelines as advisory, consider all the factors set forth in 18 U.S.C. §3553(a), set forth factual findings on the record, and provide an adequate explanation for the sentence imposed. *Id.* To fashion a substantially reasonable sentence, the Court has considerable discretion as to the weight of each of the §3553(a) factors. As a result, the applicable advisory Guideline range is only one of the many co-equal factors listed in 18 U.S.C. §3553(a) that the Court must consider. *Id.* The Court may give each factor whatever weight it deems appropriate.

Importantly, a sentencing court must not presume that the Guidelines range is reasonable but instead must make an individualized assessment based on the facts presented. *Id.* There are many instances where the Guideline range will not yield a reasonable sentence. *United States v. Hunt*, 459 F.3d 1180, 1185 (11th Cir. 2006); see also *Nelson v. United States*, 129 S. Ct. 890, 892 (2007)(holding that the Guidelines are not only not mandatory on sentencing courts; they are not presumed reasonable). The district courts freedom to impose a reasonable sentence outside the range is unfettered. *Rita v. United States*, 127 S. Ct. 2456, 2467 (2007). Post *Booker*, the Eleventh Circuit has affirmed numerous below guideline sentences even without the presence of defendant cooperation, which in this case in in applicable since Ms. Berman has cooperated without hesitation. *See United States*

15

*v. Williams*, 435 F.3d 1350 (11th Cir. 2006)(affirming 90 month sentence to be sufficient but not greater than necessary to punish even though the low end of the guidelines was 188 months). Indeed, it is the sentencing courts duty to make its own reasonable application of the §3553(a) factors, and to reject the advice of the Guidelines if after due consideration the result they suggest does not comport with the sentencing courts view of an appropriate sentence. *Id. Kimbrough*, 128 S. Ct at 577 (Scalia concurring).

In May 2010, the Attorney General of the United States issued a revised "Department Policy on Charging and Sentencing." (See Exhibit L) This Policy rejects a blind adherence to a guidelines sentence. Instead, it sets out a policy anchored in the notion that "equal justice depends on individualized justice, and small law enforcement depends on it." *See May 19, 2010 Memorandum to All Federal Prosecutors, at pg. 1*. The policy acknowledges that generally prosecutors will advocate for a sentence within guideline range. However, the policy seeks advocacy at sentencing that follows "from an individualized assessment of the facts and circumstances of each particular case." *Id.* at 2-3.

Here, the individual facts concerning the history and characteristics of Ms. Berman and the nature of the offense demonstrate that the general rule of sentencing within the guidelines range is inappropriate as it will not serve the ends of individualized justice. The individualized facts and the Court's own reasonable

16

application of the §3553(a) factors, will show that a sentence below the Guidelines is reasonable.

## VIII. REQUEST FOR VOLUNTARY SURRENDER

Ms. Berman respectfully asks that she be permitted to voluntary surrender to her designated place of incarceration. Ms. Berman is aware that this Court does not normally permit sentenced defendants to self-surrender, however in this unique case, there are compelling reasons to deviate from the Court's usual course.

First, Ms. Berman has cooperated with the Government since she was first arrested and learned of the underlying prosecution. In preparation for trial of co-defendant Melton, Ms. Berman met on multiple occasions with the Government agents and provided information that she had knowledge of regarding the charged offense. There is still unindicted defendants in this case and there is a strong possibility that Ms. Berman will be required to meet with the Government and the agents in the near future. The nature of this case requires that Ms. Berman review multiple documents that are in possession of the Government and the Agents which can be facilitated if she is permitted to self-surrender.

Furthermore, Ms. Berman has appeared at every Court hearing, at every pre-trial supervision's request, at her status conference, change of plea, and at every request from the Government and the Agents. She has in essence fulfilled each and every condition of her pre-trial release incident free. Allowing Ms. Berman to

voluntarily surrender is considered the one positive factor under the Bureau of Prisons guidelines which will determine her final security custody's level. See BOP Inmate Security and Custody Classification, Policy Number P5100.081, 09/12/06 Chapter 4, page 5, Voluntary Surrender.[1]

## IX. CONCLUSION

Ms. Berman is truly contrite. She deeply regrets in participating in the charged offense. It need not be said that she has learned from her experience. She understands that she must be held accountable for her illegal conduct and accept the consequences which include the serving of a term of imprisonment.

Here, a sentence below the low end of the sentencing guideline range set forth by United States Probation Officer and below the amended guideline range in light of the yet to be filed motion for sentence reduction based on Ms. Berman's cooperation, is reasonable.

Ms. Berman respectfully asks this Court impose a sentence of below the low end of the post 5K1.1 motion for sentence reduction guideline determination, along with any other condition that the Court deems appropriate. Such a sentence will be consistent with the factors mandated by Title 18 U.S.C. § 3553(a).

---

[1] The complete policy can be reviewed on the BOP website at www.bop.gov/datasource/execute/bspolicy.loc.

Done this 21ˢᵗ day of March 2016.

*/s/ Mariem J. Paez, Esq.*
Florida Bar No.: 104538
Law Offices of Mariem J. Paez, PLLC
4300 W. Flagler Street, Suite #102
Miami, Florida 33134

## CERTIFICATE OF SERVICE

I HEREBY DO CERTIFY that on March 21ˢᵗ 2015 I filed the foregoing document with the Clerk of Court using the CM/ECF and have mailed copies via the United States Mail to all parties that are not participants of the CM/ECF Electronic Filing System.

*/s/ Mariem J. Paez, Esq.*
Florida Bar No.: 104538
Law Offices of Mariem J. Paez, PLLC
4300 W. Flagler Street, Suite #102
Miami, Florida 33134